Whenever counsel are ready, we'll hear the second case, Curran v. Axon Enterprise. Curran v. Axon Enterprise. Mr. Buckner, whenever you're ready. Yes, Your Honor. Thank you. Your Honors, good morning. May it please the Court, I'm Elliot Buckner. I'm here on behalf of, excuse me, the appellant, Sean Curran. We are here after the district court concluded that this case requires a special relationship and then granted the motions for summary judgment filed by the defendants. The court did not reach Axon's motion regarding vicarious liability, employee relationship, agency relationship, and dependent contractor relationship. Nor did the court reach Axon's argument that there is assumption of the risk on behalf of Mr. Curran. What we're here on today, what's before the court, is really two questions. The first is, did Mr. Nelson, the individual we allege was Axon's employee or agent, who was conducting this TASER training, the Conducted Energy Weapon Training, did he owe Mr. Curran general negligence duties? The second question is, was there a special relationship that created those duties? Those two questions are not mutually exclusive. Both can exist under the circumstances of this case. Both were alleged, and Mr. Nelson has duties under both of those. Where in your complaint do you allege that Nelson owes a duty of general negligence, and where and what's that duty? Your Honor, we allege very broadly, under the notice pleading standard, that in paragraph 15, that at all times your two defendant was negligent, grossly negligent and willful and wantonly negligent. Then the following paragraph 16 of our complaint, where we allege, among other things, he failed to exercise reasonable care, failed to properly set up the training area, and then went through a list of other things that he failed to do, all of which support a general negligence theory. Below that, we allege a special relationship. The distinction between the two and the important and crucial distinction between the allegations in the complaint and the paragraphs in the complaint is, paragraphs 15, 16 only allege things that would support a general negligence claim. That's his active conduct that he did. With the special relationship, it's the conduct of a third person. That's the very nature of the special relationship, that he has a duty due to his special relationship to control the actions of a third party. So that's the distinction in the complaint. We also made it very clear in the district court that we were alleging both. We requested an opportunity to the extent the court thought we only alleged a special relationship duty, an opportunity to file an amended complaint. That was denied, and ultimately we ended up here. We've detailed a number of facts in our pleadings. They've detailed facts in their pleadings and the briefs that we filed with this court. And I'm not going to go through all of them today, but I think it's important because this is a factually intensive case. The decisions made by this court depend on those facts that have been alleged and the facts that are both undisputed and disputed. Mr. Curran was attending a two-day Axon training class related to teaching other officers how to use tasers. The two-day class was conducted by Mr. Nelson. Mr. Nelson was there on behalf of Axon. The class was arranged through Axon. First day class is all in a classroom. It's using a 357-slide Axon presentation. They go through that in the class on day two, and that's when the incident occurred where Mr. Curran was struck in the eye and severely injured. That is more of the live action where they do live firing, and then they go into these scenarios. The court's been provided with video clips of the actual scenarios where there was a brox drill set up with wrestling mats. The aggressors, Mr. Curran was one of those. Counsel, I'm going to interrupt you because I've been through some of that, and I appreciate you providing it, so feel free to resume that. But in the briefing, the legal issue of negligent training or negligent supervision comes up. Is it your position that you alleged a claim for negligent training or negligent supervision? No, Your Honor. We have not. The use of the word supervision in our complaint was not intended to allege what I think people classically think of as a negligent supervision claim. When we look at negligent supervision cases, what we usually see is it's in the employer failing to monitor or supervise their employee, who then does something to some third party. In this case, the supervision we're talking about is Mr. Nelson's active monitoring, control, administration, his function as the overall head of this training. That's the supervision we're really talking about in our complaint. We're not claiming that there is an independent cause of action based on negligent supervision. And what's the duty you allege in your complaint? The duty we allege is a general negligence duty and a special relationship duty. The general negligence duty, yes, Your Honor. Go ahead. The general negligence duty that we allege is what is, I think, very clearly laid out in the RGR case four years later. It was confirmed in the Quisenberry case. The RGR case, I don't think, broke new ground. What it did is say, here is 100-plus years of tort jurisprudence. Here's the general duties. They say, a duty of care is ordinarily owed to avoid conduct that creates risks of harm to others. The general duty is owed to those within reach of a defendant's conduct. Whenever one person is, by circumstances, placed in such a position with regard to another, that if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person or property of another. A duty arises to use ordinary care and skill to avoid such injury. And RGR goes on to discuss this duty owed to all mankind. And I see all that, the duty to take affirmative action to protect the participants in paragraph 17 of your complaint, which is the paragraph that talks about a special relationship. Is there some other place in your complaint that sets out the duty? Well, Judge, I think— We did not specifically say that he owes a general negligence duty, and then we did not go on to say, and separately owes a duty of— So the only—well, so the allegation of duty in paragraph 17, the special relationship paragraph, is where you set forth the duty? Respectfully, no, Your Honor. I believe it is set out in 15 because— 15? I think, yes, Your Honor. When you say the word negligence— Negligence? That encompasses everything? It has to. Duty breach cause harm. It has to, Your Honor. Negligence has to include that. Why isn't 16 the area where you're—I would expect that you, in response to Judge Thacker's question, to point not just to 15 but to 16? Your Honor, I had mentioned that previously in response to one of Judge Thacker's questions, that I think it's in 15. I think duty is one of the requirements of negligence, but 16 also lays out the failure to act reasonably. It talks about— It's really more failure to act than actually specifying duty, but the things that are referenced there are more in line with general negligence, I guess, is your position. Is that right? Yes, sir. Yes, sir. And, well, I would have to concede that that probably can be characterized better as breaches of that duty. Right, right. It necessarily implies that there is a duty that exists if it has then been breached. And while RGR talks about this duty to all mankind, it puts some limitations on that. There's got to be sufficient juxtaposition between space and time, between the actor and the injured. In this case, there's no question that there's sufficient juxtaposition. They were in the same place within feet of each other when all of this occurred. Mr. Curran and Mr. Nelson. They also talk about foreseeability. And while foreseeability doesn't necessarily define the duty, it doesn't establish the duty, it does help define to whom that duty is owed. And I think the statement that's in RGR is exactly what covers this case. Whether reasonable care was exercised depends upon what a reasonably prudent person with knowledge of the circumstances ought to have foreseen in regard to the consequences of his act or admission. However, the precise nature of the consequences need not be foreseen. It is enough if the act or omission is such that the party ought to have anticipated that it is liable to result in injury to others. And I think that's important because of the way the defendants in this case, or the appellees at this stage, are trying to frame the issue in this case. They're framing it as this narrow injury to Mr. Nelson's eye. But that's not what the duty was. The duty was for Mr. — I'm sorry, to Mr. Curran's eye. The duty was for Mr. Nelson to conduct himself in such a way that he did not increase the risk of harm to others that were sufficiently juxtaposed in place and time. That was really a duty owed to everyone in that room. And if Your Honors have watched — If that's the case, then what is it about the relationship between Curran and Nelson that makes it a special duty, a special relationship? It's really more, Judge, the relationship between Nelson and the trainee who discharged the taser that is the relationship that requires him to exercise some control over that individual. Is that what you allege in the complaint, the special relationship between Nelson and the trainee? We allege that there is a special relationship that gives a duty to Nelson that was then breached. And it's a duty owed to Curran to protect him. I should be more clear in the way I say that, Judge. He owes a duty to protect — Nelson owes Curran a duty to protect Curran because of the relationship, the ability to control. That's what the Shoemaker case is all about, Judge. The Shoemaker case, which says Restatement 318, applies here in Virginia. The Shoemaker case was the grandparents who permitted their adult grandson to fire his rifle on their land, knowing that he was firing it in the direction of their neighbor's house. They were in the house or around. The court said in the vicinity, and that was good enough. And the court said that they had a duty to control their grandson before he fired his rifle into the neighbor's house, killing one of the people inside the house. And you're talking now, Counselor, about the special relationship allegation. Is that right? Yes, Your Honor. Which you say is in addition to the general negligence. Yes, Your Honor. Okay. And on the special relationship aspect, does it matter? I think that the restatement applies to the possession of land in addition to the ownership of land. Is that correct? Yes, Your Honor. And in Shoemaker, and actually footnote 1 of Shoemaker, it says it's not title owner of the land. It's possessor of land or possessor of chattels. We actually have both in this case. Mr. Nelson possessed the gym. He was the one that had full control over what occurred in that gym that day. He had the ability to set up the mats. He had the ability. He handed out the tasers. He had the ability to take the tasers back. He had the ability to send people out. He controlled that piece of land, the gym, that day. He also, because of his control of those tasers, he controlled the chattel. He controlled the means by which this injury occurred. I think this case falls squarely under Shoemaker. If we change Shoemaker's facts just a little bit to make them more analogous to our facts, and I see my time's up. May I finish my thought? Yes. If we change the facts of Shoemaker just a little bit to make them more analogous to our case, I think it becomes very clear that Shoemaker applies. If instead of Shoemaker's being the grandparents being in the vicinity and just permitting their grandson to set up and shoot and having knowledge that he was there, if instead they set up the targets, they gave him the rifle, they told him where to sit, where to stand, where to fire from, they told him the direction to fire in, and they were standing right next to him when they did it, that's closer to our case than the actual facts in Shoemaker. Thank you, Your Honors. Thank you, Mr. Buckner. Ms. Peterson. Good morning, Your Honors. May it please the Court. Pam Peterson here on behalf of Appellees Axon and Mr. Nelson with my co-counsel Brian Casey. This Court should affirm the District Court's grant of summary judgment to Nelson and by extension to Axon on the vicarious liability claims on either of two grounds, either of which is equally compelling. First, as expressly held by the District Court, Virginia law does not recognize the cause of action for negligent supervision and further does not recognize the existence of a special relationship between an instructor and a student giving rise to a duty to protect from third-party harm. Thus, Mr. Nelson owed no duty to intervene to protect the plaintiff from his fellow trainee's actions. And second. Even when Mr. Nelson set up a special safety area and told them they could remove their helmets in that area? Your Honor, there was a recovery area that was set up for the role players in between active scenarios in which Mr. Curran claims that Mr. Nelson told him that he could take his helmet off during the recovery period. He acknowledges, however, specifically in his testimony, that he had the ability to have his safety glasses at the bench and was well aware of training protocols that required the use of safety glasses or some type of protective eyewear at all times by all persons anywhere in the training gym, whether or not you were inside the blue mats or outside of the mats. Well, actually, there's a question and answer at JA 676 and 677 wherein he was asked whether he was aware he needed to have the safety glasses on in that area, and he says no. Well, he was aware, Your Honor, and very specifically, I think it's important to note here that Mr. Curran was a very experienced law enforcement officer who not only was going through instructor training during this particular exercise but had gone through TASER certification training on nine separate occasions. And, Peterson, can I? I'm sorry to interrupt, but all we have is the complaint, right? So is all what you're saying in the record? Yes, it is. These are expressed testimonial admissions of Mr. Curran during his own deposition testimony. Oh, okay. So let me ask you this. So with respect to this case was dismissed at the Rule 12 stage, right? No, Your Honor. The only claim that was dismissed at the Rule 12 stage was the direct negligence claim against for failure to train against Axon. The claims at issue here are based on fully briefed summary judgment motions. Okay. And in that situation, the Court determined that there was no duty owed for third-party action and no special relationship relating to Mr. Curran and Mr. Nelson and, by extension, the vicarious liability claims to Axon. Right. But the point you're making about the safety glasses is one that's more relevant to the question of contributory negligence perhaps. But the district court never ruled on that, right? There was never a contributory negligence argument made. We fully briefed, and it was responded to by plaintiff on the merits, an assumption of the risk argument on summary judgment that was fully teed up. It was before the Court, and it was based expressly on Mr. Curran's own testimonial admissions. And plaintiff, of course, acknowledged it. But the district court didn't rule on it, right? He didn't. I think that was the question. Because he didn't need to because of the no-duty ruling. He didn't need to reach that. This Court, however, as Judge Diaz acknowledged in the earlier argument, has the discretion to decide issues that weren't decided below. So either way, I think there's an overlap clearly between the assumption of the risk and the duty issue because of foreseeability and other issues that are at play here. But let me... But those aren't, I mean, with respect for those, aren't those separate issues? I mean, assumption of risk goes to causation, I think, whether there's some causation issue. The district court ruled really on the duty. And it seems to me, you know, Virginia law is pretty clear that there's a general duty of negligence. I mean, the Quisenberry RGR, I mean, those cases are there. Sure. And Virginia law seems pretty clear to me that there can be a special relationship. Or that there's a cause of action that arises when there is a special relationship for the acts of a third person. So those two things I think everyone agrees, or maybe I'm wrong, are in Virginia law. And so, and as I understand the district court, its decision was based on the fact that there was no special relationship here. Well, that's right. Because as Judge Thacker pointed out, that's what was alleged in the complaint. Well, it may be. And that's a fair argument. Certainly, paragraph 17, you know, suggests that language. Your colleague says paragraph 16 and 15, you know, suggest a general duty. And it gets a little bit to Judge Diaz's question about is this a complaint issue or is this a — I realize it all came about in the context of summary judgment. But what are we talking here, the existence of law or what has been alleged? Well, I think both. The district court certainly found that Mr. Kern's claims were expressly grounded in special relationship and that there was no other claim alleged in the complaint. And I think that that's exactly right. If you look at paragraph 17, he alleges that a special relationship existed between Mr. Kern and Mr. Nelson. It's not pled in the alternative. That's simply what it says. What about paragraph 16? Excuse me. Yes. And that he negligently failed to protect Kern from harm caused by a third party. Okay. But what about paragraph 16? So in paragraph 16, there is some specific allegations relating to certain failures, not affirmative action, but certain failures. That goes to supervision. There is no negligent supervision claim under Virginia law. I think it's important that even though Mr. Kern alleges that Nelson set up, oversaw, implemented, ran, and supervised the ---- So if I take my clerks to a shooting range and we want to practice shooting, and one of my clerks hits a horrible shot, and they say, all right, other clerks, go sit down there behind the target and keep your goggles on. But, you know, otherwise keep your eyes out. I mean, is that not something that there would be a cause of action for in Virginia? If the allegation is and the cause of the harm is that the failure to supervise those students or those people, whether they were wearing their goggles or not. What if it's just failure to exercise due care in the operation of your business that's got some inherent danger in it? There is nothing inherently dangerous about the way that Mr. Nelson set up and ran this scenario. And I want to make it clear that this scenario has been run in tens of thousands of training classes with people involved in it. Nobody has ever before, Mr. Kern, had an eye injury in connection with any of that. But I think that in this situation, there's nothing inherently dangerous about the way that it was set up or the fact that the activity went from outside the box, you know, and was fired from outside the box. And that's because in these training incidences, you have cartridges that are being used that are not energized. There's no electrical current flowing from them. I don't mean to cut you off, but those may be great arguments, and they may cause you to win the case. I'm just struggling a little bit with the assertion that there's no duty when you're setting up a training program that involves the use of tasers, which certainly I think anyone would concede if they hit a person without protective gear on could cause some harm. Why there's not some duty arising from that? Well, we have never denied that there's a general duty of care. Mr. Nelson had the obligation to exercise due care in his own conduct to avoid injuring other people. He did not have the duty absent a special relationship to protect Kern from the actions of others, which is what happened here. And I think when you look specifically at what really are the but-for causes of this injury here, right? So the but-for causes, there's perhaps two of them. One of them is that the action went outside of the box, and the third party discharged his taser weapon with Kern downrange. And the allegation is that Mr. Nelson was negligent in not calling stop action and stopping that thing from happening. That's supervision. That's a negligent supervision claim, which is very clear, does not exist in Virginia. What if Virginia, and they may, has a minor league hockey team, and they don't have any plexiglass around in front of the seating arena? And a puck hits, the hockey player tries to shoot towards the goal, hits someone. Is that a special relationship case? Or is that a general duty that you need to, you know, hockey pucks can injure somebody, and you have a duty to put up plexiglass to have a reasonable, safe environment? Well, that can be a general duty type of a situation, Your Honor. But, again, is it the action of a third party? There, the law is clear, you have to have a special relationship. Most of them that I look to, certainly the Burns case says this, seems to be, I don't know if this is a requirement, that usually it's a third party that's doing something either illegal or at least wrongful. And in my hypothetical, the hockey player's just playing the game, just the puck got away. And arguably here, you know, I don't think we know the name of the person who fired the taser, but if we do and I missed it, I'm sorry. But whoever fired the taser, you know, he missed, so he might not have been a good shot. But I don't think there's an allegation he did something wrongful that I see in those third party cases. I think that everybody agrees here, there was no criminal or intentional conduct by that trainee. But I think it's very interesting that in the plaintiff's opening brief at pages 31 and 32, they actually say that that trainee wasn't even negligent. So query, if the trainee in firing the weapon with Curran downrange was not negligent, then how was it negligent for Mr. Nelson to not intervene to stop a non-negligent act? I mean, that just doesn't make any sense. You've got Mr. Curran who, again, the second but for thing is that he took off these safety glasses. And the evidence in his own testimonial admissions are just astounding in this regard. He'd been through nine separate training incidences in which he got the warnings, he testified he expressly knew of permanent eye injury risks. So maybe he assumed the risk. I think those are compelling facts, and maybe he assumed the risk, and that would be something that either entitles your client to summary judgment or maybe someone says that's a question of fact. But that's once you get past the duty stage, isn't it? I think that's right. But there's also in the analysis relating to Section 318 of the restatement and the Shoemaker case, there are some special requirements relating to that that plaintiffs overlook and that the district court specifically found factually did not exist here. And that is that it's not enough that you are present and that you have to have additional factors in terms of having a duty for third-party harm that in Shoemaker they found, yes, the grandparents had a greater knowledge about their property, they had a direct line of sight that was going on, and they had the ability to control their grandson. What about the fact that your client was in charge of safety as the master instructor at the time? Well, certainly, again, he had a general duty in his own conduct to not do things that would necessarily injure others. But again, the only allegations here as to what actually there's causation relating to that is the failure to cause stop action and the failure to apparently warn or remind Mr. Curran that he needed to put on his safety glasses when he took off his helmet. Those are both supervision. Those are both negligent supervision things. There's nothing about the setup or the running of the scenario in general that applies under negligent standards. Can I ask you a question? Sorry to interrupt you, but I want to read to you a portion of the appellant's brief, and you tell me why that doesn't at least satisfy a cause of action for negligence under Virginia law. And then maybe you may have disputes about the facts, and if so, you tell me. So this is the way that—and this is at page 29 and 30 of the appellant's brief. They allege that your client was running the box drill, and he admitted that he was in charge of setting it up, overseeing it, implementing it, and running the drill. He was the one who designated the safety area and told Curran that he could remove the helmet and rest as long as he was in that area. He was present during the box drill. He never called stop action, even though the video showed that participants had been outside the box on at least five separate occasions before Mr. Curran was injured. And then finally, as I indicated earlier, your client admitted, or at least it's not contested, that he was the master instructor and in charge of safety at the training. So on those facts, does Virginia law recognize a claim for negligence? No, Your Honor, not in terms of third-party action and a duty to protect. I think that that's very clear. You had to have—Mr. Nelson had to have had the awareness of the need to take action to protect Mr. Curran. And it is undisputed in this record, and the district court found, that Mr. Nelson could not see Curran at the time of this incident. And not only was Mr. Nelson testified, he could not see him. His line of sight was unlike the grandparents in Shoemaker. But he knew what the setup was because he set up the situation. He was in charge of the whole thing. And Mr. Curran, who this was his home base gym, helped him set everything up. He had the same knowledge, certainly, as Mr. Nelson did. But it's undisputed, and I think the court— Well, under Section 318, you had to have had the ability to control the situation. You had to have awareness of the necessity or the need to do it. And the district court here found that those things did not exist. And I don't think those factual findings are erroneous. How does the awareness—how did he not have awareness of the situation when he set the whole thing up? Mr. Nelson, I mean. Well, it's not when he set the whole thing up. It's when this injury actually occurred. This was a scenario that took 10 seconds. And it's undisputed that there was no direct line of sight. He didn't see—didn't know where Mr. Curran was and didn't see whether he was wearing eye protection at that particular time. So the court found there was not any evidence of an awareness that he needed to take any action to protect him. But certainly, again, just the fact that the action goes outside of the maps doesn't make it inherently dangerous. If everybody's wearing their eye protection, which Mr. Curran absolutely knew was a requirement at all times in the gym— No, again, he says—he testified that he didn't know that. At JA 676 and 677, he was asked about that, whether he knew you had to wear your eye protection at all times, and he said no. It was my understanding that everyone else watching this scenario would have to wear their safety glasses. But the role player's safety area was the safe zone. And he goes on. So at JA 648 through 49— Right, so that's a dispute of fact. I don't believe so, Your Honor, because he specifically testified that he knew the protocols for wearing the eyewear had to be at all times. How is it not a dispute of fact when you're saying he knew and I'm quoting you his deposition testimony where he says he didn't know? Well, Mr. Nelson specifically testified that he never told Curran that he could take off his helmet and not put on his safety glasses. And even Mr. Curran's testimony does not go that far. It doesn't go that far. He specifically testified he knew that the entire gym was designated as a training area, and anybody entering the gym needed to wear protective eye gear. He knew that. And these were the same protocols that he said applied in every single other training. And he also testified that he didn't know that he needed to wear his safety glasses in the safety zone that Mr. Nelson had set up. So it's in conflict. It's a dispute of fact. I don't believe so, Your Honor, because he— Okay, well, we disagree then. Yeah, I think that he— We have a dispute of fact. Yeah, respectfully, Your Honor. He was—he got all of the warnings that talked about permanent eye injury risks and the protocols very clear. He was issued safety glasses. He wore them earlier on that same day in doing the live-action firing drills. And he testified he was able to have those safety glasses at the bench with him. All of the testimony that talks about the recovery area, being able to take off of your helmet, is based on between active scenarios, not during an active scenario. And this experienced officer clearly knew of those risks. And had he been wearing his protective eye gear, this incident wouldn't have happened but for that situation. Ms. Peterson, your time is—you're well over your time, so we'll hear from your colleague. Thank you, Your Honor. And I don't—do you have anything? Yeah, we were just reserving a couple minutes for him just in case you had specific questions. But otherwise, I think we've covered everything. Okay, well, thank you very much. Thank you. That was a good shot, Mr. Buckner, right in the bucket. Thank you, Your Honor. I don't know that I could do that again if I tried ten times. You might should have been the taser guy and we wouldn't be here. That's right. Your Honors, we heard a lot of facts just now stated as facts not in dispute. But every single fact that was stated is in dispute in this case. That's one of the primary problems that we have with being here today on motions for summary judgment. There are a ton of material facts in dispute. For example, it was stated that, as fact, Mr. Nelson couldn't see Mr. Curran when the incident that ultimately took his vision and his eye occurred. That is betrayed by video clip number seven, which has been presented as part of the joint appendix to this court. At the beginning of that scenario, Mr. Nelson is standing behind the mat where he can see Mr. Curran. As the scenario unfolds, he walks in front of the mat. So it's our position. He knew he was there. He could see him. Knew he didn't have his helmet on. Knew he didn't have his glasses on. The question of whether Mr. Curran was supposed to have his glasses on or Mr. Yes, Mr. Curran was supposed to have his glasses on, he has testified unequivocally he wasn't. He was in the safe zone. That was okay. He didn't have to have his glasses there. We also have supporting evidence for that in joint appendix 92 or 798. It's the same picture, but it's the picture of the other aggressor. What we see in that picture is the second aggressor. Counsel, may I interrupt you because I think I understand your argument that there are questions of fact about breach. There's questions of fact about causation. It seems to me that's getting a little bit ahead of where we are here. As I understood the district court's order, it was related to duty. It found that you had not asserted a general duty of negligence. It found that there was no special relationship of an instructor and trainee as matters of law. I thought that's what we're here about. I didn't think the district court ruled that there was no genuine issue of material fact about breach or causation. Am I wrong? Your Honor, I think you're exactly right. I think the problem that we've got, or at least that I've got today, that we had during our briefing and that we had down below, is that the appellees have gone a little bit beyond what the scope of the issues presented to this court are by arguing assumption of the risk, by arguing other things that aren't the genuine issues that bring us here today. I absolutely agree with you, Your Honor, that the issues we're on here today is, was there a duty? I think the reason that we're here is the district court simply didn't look at general negligence principles. The district court looked at this solely as a third-party actor and the responsibility or the duty of Nelson to control that third-party actor. I think that's what the court looked at if you look at the court's ruling. And I think that's the case because in their order, we really only see RGR, Quisenberry talked about, and I think it was just in a footnote. So I think what we're here on today is duty. Judge, I absolutely agree with you. And I think when you look at general negligence principles under RGR, Quisenberry, I think we squarely fall underneath that. You look at the principles requiring a special relationship where Shoemaker comes in, I think we're squarely underneath that. And I think just a simple change in the facts of this case illustrate why both of those apply. As part of this training scenario, every single trainee that came in had to be screened to make sure they didn't have any weapons on them, other than their taser. I think the issue for the district court was where that was alleged in your complaint. I think the district court focused on where you were most clear about duty, and that's the special relationship in Paragraph 17. And you're pointing to Paragraphs 15 and 16, and for me the question is whether that's good enough to allege this general duty that does exist in Virginia. I think you're right, Your Honor. I think that is. So why are Paragraphs 15 and 16 good enough? I think 15 on its face with an allegation of negligence includes duty, breach, damage. Because everybody learns that negligence equals duty, breach, cause harm in law school. And so just saying negligence covers everything, is that your point? Yes, Your Honor. And that's candidly what the Virginia rules permit, that a statement of negligence is sufficient in itself. And I think it's because of that very reason, that when you say someone was negligent, it necessarily requires those three elements. Then the very next paragraph, 16. Does it then require you to set out those elements in your complaint? I don't believe that it does, Your Honor. I think a simple statement of negligence is sufficient. I think we do have to ultimately state what our damages are in our wherefore clause, which we've done. But I think a simple statement of negligence is sufficient to put the defendants on notice. And our complaint went well beyond that. Our complaint lists a lot of facts before we ever get to the allegation stage about what happened in this, what the breaches were. Those breaches are clearly breaches of a general duty. So I think duty is included in our complaint. Both duties, the general duty and the duty based on special relationship. And if the Court wants to just push special relationship to the side, put it on a shelf and take a look at the complaint without it, I think the complaint is sufficient just on general negligence theories. But we never got there before. We just never got there. We went down this, we're reluctant to call it a rabbit hole, but that's kind of what we did. And we heard some of that today, that it's this constant kind of pushing over to, it's got to be this control of a third party. And it doesn't. Again, just to change the facts of this very quickly, as the trainees came into the gym, they couldn't have weapons on them. Mr. Nelson required that everybody be screened for weapons so that they didn't bring in a pistol and fire that instead of their taser at someone. What if, as Mr. Nelson is screening these people, he misses somebody as they come in? Somebody comes in with live rounds loaded in a handgun. He's monitoring them, administering the training, overseeing it. He's standing right next to them as they go through the live action. He sees, oh, I forgot, that guy's got a handgun. He does nothing. He sees them put their hand on the handgun as the action's going. I see that I'm out of time. You can finish your talk. Go ahead. He pulls that handgun. He sees them do it. He's standing right there.  He sees his finger go to the trigger and he squeezes the trigger. Seven different steps where he had not only the opportunity but the duty to do something because he was in charge. He was the safety officer. Those are his active acts of negligence under general negligence principles. And at the last moment, before he squeezed that trigger, he had a duty to control that person under the special relationship because he controlled the chattel. He was present and he knew that doing so could cause harm or failure to do so could cause harm. Thank you, Your Honors. Thank you, Mr. Booker. I want to thank both counsel for a case well argued. And as I mentioned earlier, we would typically come down from the bench to greet you but can't do that today. Hope to do it again some other time. Thank you very much.
judges: Albert Diaz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.